**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THUY VAN VO,** <br> **Petitioner,** | : <br> : | |
| **v.** | : <br> : <br> : | **Civ. No. 23–4790** |
| **JOSEPH TERRA, *et al.*,** <br> **Respondents.** | : <br> : <br> : <br> : | |

**ORDER**

Pennsylvania inmate Thuy Van Vo has filed counseled Objections to Magistrate Judge Arteaga's Recommendation that I deny Vo's Amended Habeas Petition. (Doc. Nos. 32, 61, 66); 28 U.S.C. § 2254. I will overrule the Objections and deny relief.

## I. BACKGROUND

### a. Conviction

On December 13, 2011, a Bucks County jury convicted "Tony" Vo of murdering "Annie" Huynh and of theft by unlawful taking. 18 Pa. Cons. Stat. §§ 2502(a), 3921; (Doc. No. 45, N.T. 12/13/2011 V. II at 148); see Commonwealth v. Vo, No. CP–09–CR–0000472–2011 (Pa. Ct. Comm. Pl. Bucks Cnty.) On February 2, 2012, Vo was sentenced to life imprisonment. (Doc. No. 46, N.T. 2/2/2012 at 13.)

The trial evidence proved that in 2008, Vo and Huynh began dating. (Doc. No. 40, N.T. 12/7/2011 at 77.) Both spoke Vietnamese as their first language. (Id. at 45–49.) Huynh owned Kim's Nails, a salon in Southampton, Pennsylvania. (Doc. No. 39, N.T. 12/6/2011 at 188, 214.) Vo frequented the salon and routinely helped Huynh with various tasks, including banking. (Id. at 125–26; Doc. No. 40, N.T. 12/7/2011 at 77–78.) On October 30, 2010, Huynh authorized Vo to make withdrawals from her business bank account at the Citibank Southhampton branch. (Doc.

No. 41, N.T. 12/8/2011 at 132, 140–41.)

Huynh would usually leave home at 7:30 a.m., drop her son off at school, and then open the salon. (Doc. No. 40, N.T. 12/7/2011 at 9–11.) On the morning of November 8, 2010, however, two employees, Karen Pham and Gina Nguyen, found the salon locked with Huynh's car parked outside. (Doc. No. 39, N.T. 12/6/2011 at 52–53, 79–81, 117–119.) When they couldn't reach Huynh by phone, Pham and Nguyen unlocked the salon's front door to admit a waiting customer. (Id. at 51–54; 118–120.) Pham then called Vo to ask about Huynh's whereabouts. (Id. at 83–84.) In the salon, Pham, Nguyen, and the customer saw Huynh's belongings and noticed that the bathroom door was locked. (Id. at 54–57.) The customer called the police, and a responding officer forced the bathroom door and found Huynh unconscious, on the floor; she died a short time later. The cause of death was manual strangulation. (Id. at 57–59; Doc. No. 42, N.T. 12/9/2011 at 125.)

Vo arrived at the salon a short time later and spoke with Detective Craig Rudisill, but never asked about Huynh. (Doc. No. 39, N.T. 12/6/2011 at 209–11.) Rudisill subsequently told Vo and three salon employees that Huynh had been murdered in the vestibule of a neighboring restaurant. (Id. at 213-14.) The employees "fell to the ground crying, holding each other." Vo did "not show any emotion whatsoever." (Id. at 214.)

That day, police interviewed Vo twice. (Id. at 220–21; Doc. No. 40, N.T. 12/7/2011 at 59.) Vo first said that he had last seen Huynh two days before at the salon and had last spoken with her the evening before her death. (Doc. No. 39, N.T. 12/6/2011 at 223–24.) That morning, Vo said he woke up at 7:00 a.m. at his home, called to cancel a dentist appointment for Huynh's son at 7:17 a.m., and showered. (Id. at 224–25.) When Pham called to tell him that Huynh was missing, Vo told her to call the police and then left immediately for the salon. (Id. at 225–26.)

Vo told police that he had withdrawn $3,500 from Huynh's bank account to fund a land deal in Vietnam. (Doc. No. 40, N.T. 12/7/2011 at 82.) Police conducted a consent search of Vo's car and recovered $3,700 in cash. (Id. at 83.) Vo said that this money was his sister's and that he planned on wiring it to her in Vietnam. (Id. at 83–84.) Vo denied arguing with Huynh over finances or being upset that she had dinner with a male acquaintance, Khuong Ly, the night before. (Id. at 84–85.)

Police subsequently learned that Vo's T–Mobile call records showed his cellphone accessed the cell tower nearest Kim's Nails—not his home—when he placed a call at 7:17 a.m. (Id. at 189–91.) Huynh's father told detectives that she had argued with someone over the phone about money. (Id. at 221–22.) Bank records further revealed several thousand dollars of withdrawals from Huynh's Citibank account between November 1 and 6, 2010. (Doc. No. 41, N.T. 12/8/2011 at 140–43.)

The next day (November 9), Detectives David Hanks and James Schirmer went to Vo's home and were admitted by Vo's housemates. (Doc. No. 40, N.T. 12/7/2011 at 151–152.) There, the Detectives found a "very lethargic" Vo in his bedroom. (Id. at 154–158.) He said that he wanted to die, and had taken fifty Benadryl tablets. (Id. at 159.) The Detectives called an ambulance, and Schirmer rode with Vo, who acknowledged that he had recently argued with Huynh "about a casino." (Id. at 161–64.) Vo was involuntarily committed at the Einstein Medical Center. (Id. at 174–75.) On November 10, police executed a search warrant for Vo's residence and found $1,830 in cash hidden under Vo's mattress. They also recovered several gloves and a used condom in his bedroom trashcan. (Doc. No. 43, N.T. 12/12/2010 at 28–37.)

On November 12, after Vo was discharged from the hospital, he was met by Detectives Hanks and Timothy Carroll. (Doc. No. 40, N.T. 12/7/2011 at 208–09.) Vo agreed to questioning

by the police, who provided him with a Vietnamese interpreter. (Id. at 210–213.) Vo spoke "very briefly" with the interpreter before denying that he had argued on the phone with Huynh about money. (Id. at 222.) Vo then agreed to accompany the Detectives to Kim's Nails. (Id. at 227.)

At the salon, the Detectives confronted Vo with his T–Mobile call records and asked if he had killed Huynh. (Id. at 230–32.) Vo denied killing Huynh, told the Detectives that he was "stressed," and then became unresponsive. (Id.) The Detectives called an ambulance for Vo, and subsequently arrested him at the hospital. (Doc. No. 41, N.T. 12/8/2011 at 36–37.)

Charged with criminal homicide, theft by unlawful taking, and receiving stolen property, Vo was represented by Deborah Weinman (from the Bucks County Defenders), who unsuccessfully moved to suppress Vo's November 9 and 12 police statements. (Vo State Dkt., No. 4 at 2–3); 18 Pa. Cons. Stat. §§ 2501(a), 3921(a), 3925(a); (Doc. No. 39, N.T. 12/8/2011 at 1; N.T. 6/15/2011 at 14, 287.)

Vo's December 2011 jury trial lasted six days. (See Doc. Nos. 39–45.) The Prosecutor called twenty-six witnesses and introduced sixty-six exhibits into evidence. (Doc Nos. 39, N.T. 12/6/2011 at 2; 40, N.T. 12/7/2011 at 2; 41, N.T. 12/8/2011 at 2–3; 42, N.T. 12/9/2011 at 2, 76, 78; 43, N.T. 12/12/2011 at 2–3, 87–88, 137; 45, N.T. 12/13/2011 Vol. I at 2; see Trial Ex. List.) The Commonwealth's theory was that Vo and Huynh fought over Vo withdrawing money from her bank account to fund his gambling. (Doc No. 39, N.T. 12/6/2011 at 11–13.) Learning that Huynh had dinner with Ly, Vo became jealous and decided to kill her. (Id.)

The prosecutor presented highly inculpatory physical evidence, Vo's dishonest and contradictory statements, and proof of Vo's troubled relationship with Huynh. Vo's sister testified that, contrary to what he told police, Vo had not sent her money. (Doc. No. 41, N.T. 12/8/2011 at 81.) Ly testified that Huynh told him days before her death that someone with her banking

information and Social Security number "took all [her] money." (Doc. No. 42, N.T. 12/9/2011 at 141–42.) Cell phone tower evidence proved that Vo went to a nearby Casino on each day he withdrew money from Huynh's account. A DNA expert testified that a presumptively positive blood droplet on a glove retrieved from Vo's trashcan matched Huynh's DNA profile. (Id. at 43–44, 95–96.) A hair recovered from the gloves had been forcibly pulled from a person's scalp; the hair's DNA matched that of Huynh. (Id. at 43, 95–96.) In a voicemail from Vo to Huynh the night before her body was found, Vo's jealousy was evident as he asked "did Khuong come and visit with you today? I know he came and visited you. He came in his Mercedes." (Doc. No. 43, N.T. 12/12/2011 at 157.) Moreover, a cell phone and tower site technology expert, Detective Joseph Coffman, testified that his analysis of Vo's call records indicated that Vo stalked Huynh; he was near her home when he repeatedly called her on November 7 and Kim's Nails at 7:17 a.m. on November 8. (Id. at 154–159.) He was near Huynh's home when she had dinner with Ly. (Id. at 174-175.)

Vo called four witnesses, including experts in cellphone technology, forensic accounting, and forensic biology. (Doc. Nos. 42, N.T. 12/9/2011 at 2, 172–73; 43, N.T. 12/12/2011 at 2–3, 214; 44, N.T. 12/13/2011 Vol. I at 2, 11, 24.) Vo argued that the Commonwealth's case was circumstantial, there was little evidence of Vo gambling, and the DNA found on the glove in Vo's trashcan could have originated from a condom (which was also found in Vo's trashcan). (Doc. No. 39, N.T. 12/6/2011 at 31–39.) The defense's cellphone technology expert, Manfred Schenk, testified that Vo's cellphone did not necessarily connect to the nearest cell tower when he made calls. (Doc. No. 42, N.T. 12/9/2011 at 182–88.)

On the same day deliberations began, the jury found Vo guilty of first-degree murder and theft by unlawful taking. (Doc. No. 45, N.T. 12/13/2011 V. II at 148.) He was sentenced to life

in prison. (Doc. No. 46, N.T. 2/2/2012 at 13.)

**b. State Post–Conviction Proceedings**

In his direct appeal, Vo challenged, *inter alia*, the trial court's determination that he was not subject to custodial interrogation when he made un-*Mirandized* statements on November 9 and 12, 2010. (Statement of Matters Complained of on Appeal, No. 52.) The Superior Court affirmed Vo's conviction on the merits, and the Supreme Court denied allocatur. See Doc. No. 56–1 at 22–51; Commonwealth v. Vo, 2013 Pa. Super. Unpub. LEXIS 3211 (Pa. Super. Ct. July 23, 2013), allocatur denied, 84 A.3d 1065 (Pa. 2014) (table).

On November 20, 2014, Vo filed a *pro se* PCRA petition. (Pet. for Post Conviction Collateral Relief, No. 62.) Appointed counsel, Elissa Heinrich, filed an Amended PCRA Petition. (Dec. 2, 2014 Order, No. 63; Def.'s Am. Pet. for Post-Conviction Collateral Relief, No. 66.) On March 31, 2016, the PCRA Court vacated Heinrich's appointment, and appointed Dean Malik. (Mar. 31, 2016 Order, No. 79.) Malik then filed a motion to hire John Minor, a cellphone geolocation technology expert; the PCRA Court denied the Motion. (Mot. for Ct. Approval of Expert Services, No. 85; Jan. 11, 2018 Order, No. 89.) Malik's appointment was then vacated, and the court appointed Patrick McMenamin. (Jan. 12, 2018 Order, No. 88.)

On April 12, 2018, McMenamin filed Vo's Second Amended PCRA Petition. (Second Am. Pet. for Relief Pursuant to the Post–Conviction Relief Act, No. 91.) Vo claimed that trial counsel Weinman had ineffectively failed to: (1) advise Vo of his right to testify; (2) obtain surveillance footage from a local casino; (3) retain a competent cell tower technology expert; and (4) object to Detective Craig Rudisill's testimony. (Id.) During the PCRA proceedings, Vo used a Vietnamese interpreter.

On November 25, 2019, Vo submitted a *pro se* motion to replace McMenamin. (Mot. for

Change of Appointed PCRA Counsel, No. 102.) At the resulting status hearing, however, Vo testified that he wished to continue with McMenamin. (Doc. No. 48, N.T. 2/25/2020 at 5.) When Vo quickly changed his mind again, however, McMenamin filed a motion to withdraw. (Doc. No. 49, N.T. 7/6/2020 at 2–3.) After the PCRA court colloquied Vo, it declined to replace McMenamin. (Id. at 20-26.)

After Weinman and Vo testified at an evidentiary hearing before the PCRA Court, Vo's Second Amended PCRA Petition was dismissed. (Doc. No. 50, N.T. 8/3/2021 at 2; Aug. 18, 2022 Order, No. 136.) The Superior Court, and the Supreme Court again denied allocatur. Vo v. Commonwealth, 2023 Pa. Super. Unpub. LEXIS 1887 (Pa. Super. Ct. Aug. 1, 2023), allocatur denied, 312 A.3d 906 (Pa. 2024) (table).

**c. Federal Habeas Proceedings**

On November 16, 2023, Vo timely placed his *pro se* Petition for Writ of Habeas Corpus in the prison mailing system. (Doc. No. 1.) I referred the Petition to Magistrate Judge Arteaga, who appointed the Federal Defender to represent Vo. (Doc. No. 28.) On June 26, 2024, Vo filed his counseled Amended Petition and on January 6, 2025 his Supporting Memorandum of Law. (Doc. Nos. 32, 38.) Vo argues:

1. The admission of Vo's un–*Mirandized* statements—made (a) between the police encountering Vo in his bedroom on November 9 up until his arrest on November 12, and (b) on November 8 at the Upper Southampton Police Station—violated the Fifth and Fourteenth Amendments;
2. Trial counsel ineffectively failed to consult with and call a competent cell tower technology expert;
3. Trial counsel failed to consult with and call the testimony of an expert in

Vietnamese culture;

4. Trial counsel failed to obtain a Vietnamese interpreter;
5. Trial counsel failed to object to the prosecutor's misstatements throughout trial; and
6. Vo suffered cumulative prejudice because of these errors.

(Doc. No. 38 at 2–4.) The Commonwealth opposes relief. (Doc. No. 56.)

On June 11, 2026, Judge Arteaga submitted his Report and Recommendation. concluding (with the same numbering system as discussed above) that Vo's claims 1(b) and 3 were procedurally defaulted without excuse, and claims 1(a), 4, 5, and 6 were meritless. (Doc. No. 61.)

Vo has filed counseled Objections to the Report and Recommendation. (Doc. No. 66.) The Commonwealth, again, opposes. (Doc. No. 71.)

## II. LEGAL STANDARDS

In reviewing a Magistrate Judge's Report and Recommendation, I must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). I may "accept, reject, or modify, in whole or in part" the Magistrate Judge's findings or recommendations. Id. As to those portions to which no objections have been made, I may accept the recommendation so long as I "satisfy [myself] that there is no clear error on the face of the record." Fed. R. Civ. P. 72(b) Advisory Committee Notes; see also Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987).

A § 2254 petitioner must first exhaust available remedies in state court. Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997) (citing 28 U.S.C. § 2254(b)(1)(A)). A claim is exhausted if it was "fairly presented" to the state courts. Bronshtein v. Horn, 404 F.3d 700, 725 (3d Cir. 2005) (citing Picard v. Connor, 404 U.S. 270, 275 (1971)).

Where, as here, a claim is adjudicated on the merits in state court, I may not grant habeas relief unless the adjudication is: (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A claim is procedurally defaulted where the state court did not address its merits because of a state procedural bar. See Harris v. Reed, 489 U.S. 255, 262–63 (1989). A claim is also procedurally defaulted if the petitioner failed to exhaust, and the state courts would not have considered the claim because of a state procedural bar. Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991). The Court may not review a procedurally defaulted claim unless the petitioner demonstrates: (1) cause for the default, and (2) actual prejudice resulting from a violation of federal law, or a "fundamental miscarriage of justice" because of the procedural bar. Id. at 750.

## III. DISCUSSION

Vo objects to Judge Arteaga's resolution of claims 1(a), 2, 4, 5, and 6. (Doc. No. 71.) Accordingly, I will review those portions of the Report and Recommendation *de novo*. 28 U.S.C. § 636(b)(1)(C). I will review those portions to which Vo does not object—Judge Arteaga's analysis of claims 1(b) and 3—for clear error. See Fed. R. Civ. P. 72(b) Advisory Committee Notes.

### a. Claim 1(a): Admission of Vo's Un–*Mirandized* Statements From November 9 till his arrest on November 12.

Vo challenges Judge Arteaga's determination that he was not in custody: (1) in his bedroom on November 9; (2) in an ambulance and at the hospital on November 9; (3) in the hospital lobby and during the ride to the police station on November 12; (4) in the police station on November 12; and (5) at Kim's Nails on November 12. (Doc. No. 66 at 2–11.) The

Commonwealth urges me to adopt Judge Arteaga's conclusions as appropriate under § 2254(d)'s highly deferential standard of review. (Doc. No. 71 at 1–6.) I will overrule Vo's Objection.

Custody "presents 'a mixed question of law and fact' qualifying for independent review." Thompson v. Keohane, 516 U.S. 99, 113 (1995). Custody is determined by "the objective circumstances of the interrogation, not . . . the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). There are "two discrete inquiries" for federal habeas review of state court custody determinations: (1) "what were the circumstances surrounding the interrogation;" and (2) "given those circumstances, would a reasonable person have felt . . . at liberty to terminate the interrogation and leave." Thompson, 516 U.S. at 112–13. The first inquiry is "distinctly factual" and "attract[s] a presumption of correctness under 28 U.S.C. § 2254(d)." Id. "The second inquiry, however, calls for application of the controlling legal standard to the historical facts." Id. "[The Court] may grant relief only if every 'fairminded juris[t]' . . . would have made a different decision." Dunn v. Reeves, 594 U.S. 731, 739–40 (2021) (citing Harrington v. Richter, 562 U.S. 86, 101 (2011)).

After the June 15, 2011 suppression hearing, the court ruled that Vo was not in custody on November 9 and 12, 2010. (N.T. 6/15/2011 at 285–87.) On direct appeal, the trial court's Rule 1925(a) opinion provided written factual findings concerning Vo's custodial status, which the Superior Court adopted. (Doc. No. 56-1 at 22–40); Commonwealth v. Vo, 2013 Pa. Super. Unpub. LEXIS 3211, at *1–2 (Pa. Super. Ct. July 23, 2013). The suppression hearing testimony of Detectives Schirmer, Hanks, and Carroll support the court's findings. (See N.T. 6/15/2011 at 59–208.) Neither Vo's Amended Petition nor his Objections challenge a factual finding relevant to this custody inquiry. (Doc. Nos. 38 at 13–25; 66 at 2–11.) Accordingly, Vo does not rebut § 2254(d)'s presumption of correctness. Thompson, 516 U.S. at 112–13.

Vo objects to the weight Judge Arteaga afforded various factors in concluding that Vo voluntarily spoke to law enforcement, and that a reasonable person in Vo's position would have felt free to leave. (Doc. No. 66 at 2–11.) Unfortunately, Vo relies on non-controlling precedent. 28 U.S.C. § 2254(d)(1) (habeas relief is limited to "unreasonable application[s] of, ***clearly established*** Federal law, as determined by the Supreme Court of the United States") (emphasis added). Moreover, Vo fails to appreciate that a federal habeas court may not conduct its "own independent inquiry into whether the state court was correct as a *de novo* matter." Yarborough v. Alvarado, 541 U.S. 652, 665 (2004). Accordingly, "differing indicators" will support the conclusion that a state court's custody determination was not "objectively unreasonable." Id.

Although Vo points to facts that suggest he might have been in custody, Judge Arteaga relied upon facts that supported the opposite conclusion. For instance, on November 9, Vo was initially questioned in his bedroom—obviously a less restricted environment than a police station. (N.T. 6/15/2011 at 267–70); see United States v. Willaman, 437 F.3d 354, 360 (3d Cir. 2006) ("When a person is questioned on his own turf, . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." (quoting United States v. Czichroy, 378 F.3d 822, 826 (8th Cir. 2004).). Vo was then willingly placed in an ambulance and was restrained by medical personnel for his own safety, not for any law enforcement purpose. (N.T. 6/15/2011 at 70–71.) At the emergency room, Detective Schirmer had minimal contact with Vo. (Id. at 101–03.)

Although Vo had a cell phone when the hospital discharged him on November 12—and so could have arranged his own transportation home—he accepted the ride to the police station Detectives offered. (Id. at 146–48.) At the station, Detectives told Vo that he was not under arrest and was free to leave. When he was questioned, Vo sat closest to the conference room's open

door. (Id. at 153–54.) When Vo later agreed to accompany the Detectives to Kim's Nails, he was there informed once again (before being questioned) that he was not under arrest. (Id. at 170–71.) The questioning stopped when Vo became unresponsive, and the police sought medical assistance within ten minutes of Vo's return to the station. (Id. at 200–02.)

Given these "differing indicators" it is apparent that "fair-minded jurists could disagree over whether [Vo] was in custody." Yarborough, 541 U.S. at 664–65. Vo thus fails to rebut "he presumption that state courts know and follow the law." Woodford v. Visciotti, 537 U.S. 19, 24 (2002). Accordingly, I will overrule his Objection.

**b. Claim 1(b): Admissions of Vo's Un–*Mirandized* Statements from November 8.**

Judge Arteaga concluded that this claim was procedurally defaulted without excuse. (Doc. No. 61 at 19.) Vo does not object to Judge Arteaga's analysis. (See Doc. No. 66.) At the June 2011 suppression hearing, Vo narrowed his motion to suppress, no longer seeking suppression of his un-*Mirandized* November 8 statements. (N.T. 6/15/2011 at 214.) When, on direct appeal, Vo then challenged the admission of these statements, the Superior Court appropriately concluded that he had waived this argument under Pennsylvania law. Commonwealth v. Vo, 2013 Pa. Super. Unpub. LEXIS 3211, at *1–2 (Pa. Super. Ct. July 23, 2013); see Pa. R. App. P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Federal habeas relief is thus inappropriate. See Coleman v. Thompson, 501 U.S. 722, 729 (1991) (Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); Werts v. Vaughn, 228 F.3d 178, 194 (3d Cir. 2000) (a denial of appellate review under Pennsylvania procedural rules results in procedural default).

Accordingly, I find no clear error and will adopt Judge Arteaga's Recommendation as to

this claim.

**c. Claim 2: Failure to Consult with a Competent Cell Tower Technology Expert.**

Vo urges that his trial counsel ineffectively failed to: (1) prepare herself or the defense's cell tower technology expert, Manfred Schenk; and (2) locate a different, more qualified cell tower technology expert. (Doc. No. 38 at 36–42.) The state court's rejection of these claims was thus an "unreasonable determination of the facts;" warranting my *de novo* review. (Id. at 42–44.); see 28 U.S.C. § 2254(d)(2). Judge Arteaga concluded that the Superior Court did not act unreasonably, however. (Doc. No. 61 at 64–70.) I will overrule Vo's Objection.

First, the Superior Court did not unreasonably determine the facts:

> Appellant failed to establish [at PCRA] that trial counsel was ineffective for failing to call [an] expert in [the] area of cell phone transmissions and cell tower technology because Appellant failed to identify [an] expert who was available and willing to testify to information that would have been helpful to Appellant's defense.

Commonwealth v. Vo, 2023 Pa. Super. Unpub. LEXIS 1887, at *4 (Pa. Super. Ct. Aug. 1, 2023). The record supports the Superior Court. Vo failed to show that John Minor—the expert Vo urges should have been called—was available to testify at Vo's 2011 trial. (Doc. No. 52 at 45–58.) In 2018, the PCRA Court thus denied Vo's request for funds to hire Minor. (Jan. 11, 2018 Order, No. 89); see Commonwealth v. Albrecht, 720 A.3d 693, 707 (Pa. 1998). ("The provision of public funds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the court.") Accordingly, the Superior Court reasonably found that Vo had "failed to identify [an] expert who was available and willing to testify to information that would have been helpful." Vo, 2023 Pa. Super. Unpub. LEXIS 1887, at *4.

In any event, Vo cannot show that Weinman was ineffective. Vo must show that trial counsel's performance was both deficient and prejudicial. Strickland v. Washington, 466 U.S.

668, 687 (1984). This inquiry is "highly deferential," and must be evaluated "from counsel's perspective at the time." Id. at 689. "This analysis is 'doubly deferential' when, as here, a state court has decided that counsel performed adequately." Dunn, 594 U.S. at 739 (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). Accordingly, "strategic choices made after thorough investigation . . . are virtually unchallengeable." Strickland, 466 U.S. at 690.

Here, Judge Arteaga concluded that, even on *de novo* review, Weinman did not perform deficiently. She testified at PCRA that she "had a very hard time finding a cell phone expert" as the "technology was just starting to be used by law enforcement . . . [and] it only had maybe been used once before in Bucks County." (Doc. No. 50, N.T. 8/31/2021 at 13–14.) Schenk "was the only [expert Weinman] could find, period." (Id. at 21.) Weinman "talked to [Schenk] several times," but found it "very hard to get definitive answers out of him." (Id. at 22.) When she realized "he really wasn't giving [her] the information [she] needed," she turned to the internet "to try and find as much information as [she] could about the accuracy of cell towers." (Id. at 25.) Weinman then carefully cross-examined the Commonwealth's expert, Detective Coffman, successfully calling into question the accuracy of using call logs to pinpoint the caller's location. (Doc. No. 43, N.T. 121/2011 at 190–96); see Reinert v. Larkins, 379 F.3d 76, 95 (3d Cir. 2004) ("[T]rial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross–examine prosecution witnesses and elicit helpful testimony.")

When confronted with new technology, Weinman: (1) retained the only expert she could find; (2) consulted, qualified, and presented his testimony; and (3) conducted her own research to bolster the effectiveness of her cross-examination. Although Schenk's testimony was not as helpful as Weinman hoped, she was not ineffective for failing to obtain a second expert, especially when the record shows that one was not available. (See Doc. No. 42, N.T. 12/9/2011 at 191–92);

see also Eichinger v. Wetzel, 2019 U.S. Dist. LEXIS 8562, at *113 (E.D. Pa. Jan. 16, 2019) ("Having obtained the opinion of two experts, counsel were not obligated to seek out additional experts in the hope that they would provide more favorable opinions."); Bashir v. Smith, 2023 U.S. Dist. LEXIS 172131, at *22 (M.D. Pa. Sep. 26, 2023) (same).

In these circumstances, Vo has not shown that trial counsel's "representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. I will thus overrule Vo's Objection and adopt Judge Arteaga's Recommendation as to this claim.

**d. Claim 3: Trial Counsel's Failure to Retain an Expert in Vietnamese Culture.**

Vo next claims that Weinman should have "present[ed] the testimony of an expert in Vietnamese culture" to "contextualize Mr. Vo's emotional reaction" to Huynh's death. (Doc. No. 38 at 43–45.) Vo concedes that this claim is procedurally defaulted but urges that he can show cause and prejudice excusing this default. (Id. at 48–49.) Judge Arteaga concluded that the claim is "meritless and offers no basis for habeas relief." (Doc. No. 61.) Vo does not object. (See Doc. No. 66 at 43.)

The record reveals that any expert testimony on Vietnamese culture that Vo presented would have been undermined by evidence: (1) of the emotional reaction of other Vietnamese individuals, and (2) that Vo already knew Huynh was dead. (See Doc. No. 40, N.T. 12/7/2011 at 45) (Huynh's father "was extremely upset" and "sobbing . . . almost uncontrollably."); (Id. at 46) (Huynh's three Vietnamese employees "fell to the ground and began crying instantly" upon learning of Huynh's death"); (see also Doc. No. 39, N.T. 12/6/2011 at 211) ("[T]he Defendant never asked what happened to [Huynh], was she alive, was she dead, was she okay, was anything wrong with her.") Vo, thus, cannot satisfy Strickland's prejudice prong by proving "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." 466 U.S. at 694.

As this claim is meritless, Vo's postconviction counsel appropriately did not present it at PCRA. Because Vo's procedural default thus is not excused, Judge Arteaga correctly dismissed this claim. See Martinez v. Ryan, 566 U.S. 1, 9 (2012).

**e. Claim 4: Trial Counsel's Failure to Obtain a Vietnamese Interpreter.**

Vo next urges that Weinman "was aware that Mr. Vo's primary language was Vietnamese," and that "reasonable counsel would have been on notice that [he] required an interpreter at trial because of his limited ability to understand the English language." (Doc. No. 38 at 40–52.) Vo concedes that this claim was procedurally defaulted, but urges that he can show cause and prejudice to excuse this default: PCRA counsel's deficient performance. (Doc. No. 38 at 54.) Judge Arteaga concluded that Vo's procedural default was not excused as this claim is meritless. (Doc. No. 61 at 22–30.) Vo objects to the conclusion.

"Federal courts cannot hear procedurally defaulted claims 'unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse [his] default.'" Johnson v. Superintendent, Mahanoy SCI, 144 F.4th 178, 184 (3d Cir. 2025) (quoting Lines v. Larkin, 208 F.3d 153, 159–60 (3d Cir. 2000)). When state law requires a petitioner to raise ineffectiveness claims in a collateral proceeding, federal review of those ineffectiveness claims that are procedurally defaulted is permitted only when: "(a) the default was caused by ineffective assistance of post-conviction counsel . . . (b) in the initial-review collateral proceeding . . . and (c) the underlying claim of trial counsel ineffectiveness is 'substantial,' meaning 'the claim has some merit.'" Cox v. Horn, 757 F.3d 113, 119 (3d Cir. 2014) (citing Martinez, 566 U.S. at 13–16).

Because Vo's claim is not "substantial," his PCRA counsel, Patrick McMenamin, was not ineffective for failing to pursue it. Accordingly, his procedural default may not be excused.

When a state court makes a finding of fact, that finding is "presumed to be correct," and

the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Here, the suppression court found at its June 2011 hearing that Vo "can and does speak English." (N.T. 6/15/2011 at 285–86.) The trial court reiterated in its Rule 1925(a) opinion that Vo "understands and speaks English." (Doc. No. 56–1 at 35.) The Superior Court adopted that finding. Vo, 2013 Pa. Super. Unpub. LEXIS 3211, at *4–5.

The evidence supporting Vo's English comprehension is substantial. Detective Schirmer testified that Vo has an "accent," but still "speaks English very well" and is "able to communicate fluently." (Doc. No. 40, N.T. 12/7/2011 at 154.) Detective Hanks testified that there was not "any issue with communicating with [Vo] in English," and that Vo reported "help[ing] [Huynh] when she needed help speaking English." (Id. at 77, 98.) Similarly, a Citibank branch manager testified that Vo's "English was better" than Huynh's, and that Vo assisted Huynh with communicating in English. (Doc. No. 41, N.T. 12/8/2011 at 128.) Moreover, in a related hearing, Vo testified several times that he could understand questions posed to him in English. (Doc. No. 47, N.T. 4/1/2013 at 9–10, 18–19, 25, 29.) Finally, Judge Arteaga accurately observed that both the state and federal record is replete with *pro se* filings authored by Vo in English. (See Doc. No. 61 at 27 n.18.)

Vo fails to rebut the finding of the state court that he "understands and speaks English" by clear and convincing evidence. (Doc. No. 56–1 at 35); see 28 U.S.C. § 2254(e)(1). Weinman was thus not deficient in failing to secure a Vietnamese interpreter for Vo, and Vo is unable to satisfy Strickland's performance prong. See Wallace v. Glover, 2013 U.S. Dist. LEXIS 47464, at *57 (D.N.J. April 2, 2013) ("[I]t was not below objective standards of reasonableness for [counsel] to omit obtaining an interpreter for a client who already spoke sufficient English on his own.").

In these circumstances, because Vo's claim is not "substantial," he cannot "show that his state post-conviction counsel could have obtained a different result had he presented the now-

defaulted ineffective-assistance-of-trial-counsel claim." Workman v. Superintendent Albion SCI, 915 F.3d 928, 938 (3d Cir. 2019); see Fowler v. Mooney, 2015 U.S. Dist. LEXIS 152713, at *28 (E.D. Pa. Aug. 31, 2015) ("There was no cause or prejudice excusing a procedural default, under Martinez, because there was no viable claim of trial counsel's ineffectiveness to begin with."), report and recommendation adopted, 2015 U.S. Dist. LEXIS 152112 (E.D. Pa. Nov. 9, 2015). Accordingly, I will overrule Vo's Objection.

**f. Claim 5: Trial Counsel's Failure to Object to Prosecutor's Misstatements.**

Vo next asserts that his trial counsel ineffectively for failed to object to the [prosecutor's alleged mischaracterization of: (1) when Vo said he was leaving his home on November 8; (2) the amount of time Vo waited before leaving his home; (3) which witness saw Huynh's body; (4) Detective Coffman's testimony regarding his use of historic call detail records; and (5) the burden of production Vo face when presenting expert testimony. (Doc. Nos. 32 at 32–35; 38 at 55–59.) Once again, Vo concedes that this claim is procedurally defaulted. (Doc. No. 38 at 59.) Judge Arteaga nonetheless evaluated Vo's claim on the merits. (Doc. No. 61 at 30–31); see 28 U.S.C. 2254(b)(1) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust.") Judge Arteaga concluded that Vo failed to show either deficient performance or prejudice. (Doc. No. 61 at 42.) Vo now objects to Judge Arteaga's conclusions concerning the prosecutor's statements, respectively (1), (2), and (3). (Doc. No. 66 at 16.) Having reviewed the record *de novo*, I will overrule Vo's Objection.

**1. When Vo left his home.**

Vo urges that Weinman should have objected to the prosecutor's remark that "[Vo] [c]laims that he left home immediately upon receiving the call from Karen [Pham at 9:07 a.m.] about the problem at the salon." (Doc. No. 45, N.T. 12/13/2011 at 83–84.) Vo's phone records between 9:00 am and 10:00 a.m. that day indicated: (1) a two–minute call from Pham at 9:07 a.m.

using a cell tower located near Vo's residence, (2) a two-minute call to Pham at 9:16 a.m. using the same tower, (3) a two-minute call to Pham at 9:27 a.m. using the same tower, (4) a four-minute call to Pham at 9:31 a.m. using a different tower near Vo's residence, and (5) a one-minute call from Gina Nguyen at 9:53 a.m. using a tower between Vo's residence and Kim's Nails. (Doc. No. 40, N.T. 12/7/2011 at 197–204.) Vo argues that during the 9:16 call to Pham—not during the 9:07 call—he said he would leave "immediately." (Doc. No. 38 at 67–68.)

Yet, the prosecutor reasonably credited the testimony of Detective Rudisill amid Vo's differing accounts to detectives. Compare (Doc. No. 40, N.T. 12/7/2011 at 205 (Detective Rudisill)) ("[Vo] stated that, when he received the call from [Pham], he stated to me it was approximately, 9:00. The records indicate that it was 9:07 he received it. He stated that he would be leaving [his residence] immediately.") with (Id. at 82 (Detective Hanks)) ("Following the second conversation with Karen [Pham], [Vo said] that he left his West Godfrey Street house, and he drove to the nail salon."). Accordingly, the prosecutor's comment was not improper, and Weinman was not obligated to object. See Werts, 228 F.3d at 203.

Vo takes issue with the prosecutor's related remark that "[he] apparently [took] almost 40 minutes before he decide[d] he is going to go [to the salon]." (Doc. No. 45, N.T. 12/13/2011 at 83–84.) The call records indicate that Vo likely left his house at 9:31 a.m. Assuming Vo promised at 9:07 to leave "immediately", he waited only twenty-four minutes. (See Doc. No. 40, N.T. 12/7/2011 at 197–205.) Yet again, the prosecutor's comment "must be evaluated in context when assessing [its] impropriety." Robinson, 485 U.S. at 33. The prosecutor twice stated that Vo was at his residence during the 9:07, 9:16, and 9:27 a.m. phone calls. (Doc. Nos. 40, N.T. 12/7/2011 at 197–205; 45 N.T. 12/13/2011 Vol. II at 95.) Moreover, the trial court ***twice*** instructed the jury that the prosecutor's closing arguments were not evidence. (Doc. Nos. 39, N.T. 12/6/2011 at 5;

45, N.T. 12/13/2011 Vol. II. at 3–4.) In these circumstances, Vo obviously cannot meet his "heavy burden" to show that he was prejudiced by this purported 16-minute inaccuracy. Oelsner v. United States, 60 F. App'x 412, 418 n.7 (3d Cir. 2003) (citing United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993)).

**2. When others learned of Huynh's death.**

Vo next urges that Weinman should have objected to the prosecutor's comment that "[Vo] [c]laims or insinuated that [Pham] told him [Huynh] was inside the bathroom. . . . The girls didn't know any details about [Huynh] being locked in the bathroom and dead." (Doc. Nos. 38 at 68; 45, N.T. 12/13/2011 Vol. II. at 3–4.) Indeed, this comment was not accurate: Pham testified that she had not seen Huynh's body in the bathroom. (Doc. No. 39, N.T. 12/6/2011 at 91–93.) Nguyen, testified, however, that she did see Huynh's body on the bathroom floor. (Doc. No. 39, N.T. 12/6/2011 at 120–23.) Still, Nguyen only "thought that [Huynh] had a stomach ache, and she fell— she faint[ed]." (Id.) Nguyen testified that she knew that Huynh was dead only when Detective Rudisill told her, Vo, and the other salon employees together. (Id.)

Again, Weinman's failure to object does not constitute deficient performance. The prosecutor made this comment in closing when detailing "the lies the defendant told." (Doc. No. 45, N.T. 12/13/2011 Vol. II. at 80–91.) Objecting would have drawn further attention to other undisputed discrepancies between the account Vo gave, and the testimony of other witnesses. Compare (Doc. No. 40, N.T. 12/7/2011 at 81 (Detective Hanks)) ("Vo told us that he told [Pham] to knock down the door; that [Pham] and the customer opened the door.") with (Doc. No. 39, N.T. 12/6/2011 at 57–59 (Loretta Alderton ("the customer")) ("The policeman asked the employees if he could have permission to break the door in . . . he kicked the bottom out.") Moreover, Judge Arteaga correctly concluded that "no objection could have weakened the argument that Vo was

unemotional . . . because he already knew that Huynh was dead." (Doc. No. 61 at 36.)

**3. The use of call detail records to determine Vo's location.**

Vo next objects to Judge Arteaga's conclusion that "Vo has not shown prejudice from any failure of Attorney Weinman to object to the Commonwealth's comments (1) asserting Vo was at various locations, and (2) conflating Detective Coffman's use of historic call detail records with more precise techniques." (Doc. No. 66 at 17–19.)

The prosecutor's statements regarding Vo's location were logical inferences. The trial court had already overruled a similar objection. Weinman objected to testimony that Vo was at the Parx Casino on November 4, 2010, and the trial court found that the Commonwealth's cell site and tower technology expert, Detective Coffman, had provided "more than enough information to place [Vo] . . . within a certain square mileage of that tower," so that "the jury c[ould] certainly draw th[e] inference" that Vo was at the Parx Casino. (Doc. No. 43, N.T. 12/12/2011 at 169–70.) Similarly, the cell site location information and Detective Coffman's testimony provide sufficient information for the jury reasonably to infer that Vo was: (1) at the Parx Casino on November 4, 5, and 6; (2) outside Huynh's home when he called her five times between 5:48 and 6:49 p.m. on November 7; and (3) at Kim's Nails at 7:17 a.m. on November 8. (Doc. Nos. 51 at 24–46; 43, N.T. 12/12/2011 at 160–74.) Accordingly, Weinman was not deficient in failing to object to the prosecutor's comments regarding Vo's whereabouts. (See Doc. No. 45, N.T. 12/13/2011 Vol. II at 94–95.)

Judge Arteaga correctly ruled that the prosecutor confused the accuracy of using historic call records to locate a suspect with more precise location-based services. (Doc. No. 61 at 37–39); see also In re U.S. for an Ord. Directing a Provider of Elec. Commc'n Serv. to Disclose Recs. to the Gov't, 534 F. Supp. 2d 585, 590 & n.19 (W.D. Pa. 2008) (detailing methods to approximate a

phone's location). In her closing, the prosecutor thus mischaracterized the testimony of defense expert, Manfred Schenk:

> [Schenk had] the audacity, to be quite frank, to come in and suggest that the technology that the FBI uses, DEA, federal, state, local law enforcement agencies, our military uses to locate individuals is some sort of rogue science.
> . . .
> [Detective Coffman] utilized this science to interpret the data that we get on call detail records which, ironically Manfred Schenk agreed that was reliable, but he actually uses that technology live and has used it to locate a homicide suspect, to locate runaway juveniles. So he is proof positive of the reliability of the science.

(Doc. No. 45, N.T. 12/13/2011 at 93–94.)

Schenk's testimony indicates, however, that he took no issue with the precision of "location-based services" that various Government agencies use and operate based on either "trilateralization" or signals from smartphone GPS chips. (Doc. No. 42, N.T. 12/9/2011 at 201–10.) Instead, Schenk disputed Detective Coffman's use of call detail records that report the cell tower to which a caller connects to when he makes or receives a call. (Id. at 173–77.) Detective Coffman's own testimony and slides indicate that his methods were "not precise" as he could only approximate a cellphone user's location within a shaded region. (Doc. Nos. 51 at 24–46; 43, N.T. 12/12/2011 at 159–60.)

In context, Vo fails to show he was prejudiced by Weinman's failure to object to the prosecutor's misstatements. Robinson, 485 U.S. at 33. The challenged comments appear amid a sixty-three-page transcript of the prosecutor's closing statement during a six-day trial. (Doc. No. 45, N.T. 12/13/2011 at 40–103.) The prosecutor conveyed elsewhere in her closing that Vo was only "in the immediate area of" or in the "vicinity" of the relevant locations. (See, e.g., id. at 76, 91–92.) Moreover, the trial court ***twice*** instructed the jury that the Prosecutor's closing arguments were not evidence. (Doc. Nos. 39, N.T. 12/6/2011 at 5; 45, N.T. 12/13/2011 Vol. II. at 3–4.)

In these circumstances, the misstatements did not "so infect[] the trial with unfairness as to

make the resulting conviction a denial of due process." DeChristoforo, 416 U.S. at 643–45 ("[T]he prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions."). Accordingly, Vo fails to satisfy Strickland's prejudice prong, and his claim for relief based on these misstatements is meritless. 466 U.S. 488–94.

As to the portions of Judge Arteaga's analysis of this claim to which Vo does not object—mainly his claim that the prosecutor impermissibly shifted the burden of production by criticizing defense experts in her closing—there is no clear error and I will adopt Judge Arteaga's recommendation. (Doc. No. 61 at 40–42); Fed. R. Civ. P. 72(b) Advisory Committee Notes. As I have found all other contentions Vo raised in this claim to be meritless, I will overrule Vo's Objection and adopt Judge Arteaga's Recommendation dismissing Vo's claim 5.

**g. Claim 6: Cumulative Prejudice**

Finally, Vo urges that "the cumulative effect of the multiple violations is sufficiently prejudicial to require relief." (Doc. No. 38.) "The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as constitute a denial of his constitutional right to due process." Collins v. Sec'y of the Pa. Dep't of Corr., 742 F.3d 528, 542 (3d Cir. 2014). Judge Arteaga declined to find cumulative prejudice because "[t]here cannot be cumulative prejudice from one error from which [Vo] suffered no prejudice." (Doc. No. 61 at 71–72.) Vo objects. (Doc. No. 66 at 19.) Yet, as I have discussed, I agree with Judge Arteaga's observation that "[a]ll of Vo's claims are defaulted or are not the result of any state court or counsel's error other than parts of Claim 5." (Doc. No. 61 at 72.) In these circumstances, Vo fails to make out a cumulative prejudice claim. See United States v. Narducci, 18 F. Supp. 481, 502 (E.D. Pa. 1997) ("[T]he cumulative effect of each non-error does not add up to ineffective assistance of counsel: zero plus zero is still zero."). Accordingly, I

will overrule Vo's Objection and adopt Judge Arteaga's Recommendation as to this claim.

## IV. CONCLUSION

For these reasons, I will adopt Judge Arteaga's Report and Recommendation to deny and dismiss Vo's habeas petition. (Doc. No. 61.) A certificate of appealability will not issue because Vo has not made a substantial showing of the denial of a constitutional right, nor would reasonable jurists determine my assessment debatable or wrong. See 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 477-78 (2000).

* * *

**AND NOW**, this 24th day of November 2026, is hereby **ORDERED** that

1. Petitioner's Objections (Doc. No. 66) are **OVERRULED;**
2. Judge Arteaga's Report and Recommendation (Doc. No. 61) is **ADOPTED;**
3. Petitioner's Amended Petition for a Writ of Habeas Corpus (Doc. No. 32) is **DENIED with prejudice**;
4. There are no grounds on which to issue a certificate of appealability; and
5. The Clerk of Court **SHALL** close this case for statistical purposes.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

Paul S. Diamond, J.